**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| ROBERTS, TAYLOR & SENSABAUGH, INC., § § § | |
| Plaintiff, § § | |
| VS. § | CIVIL ACTION NO. H-06-2197 |
| § | |
| LEXINGTON INSURANCE COMPANY, § § | |
| Defendant. § | |

**MEMORANDUM AND ORDER**

Roberts, Taylor & Sensabaugh ("Roberts") sued Lexington Insurance Company ("Lexington"), seeking a declaratory judgment that Lexington owed a duty to defend and to indemnify Roberts in a lawsuit filed against it by a subcontractor's employee. Roberts has moved for partial summary judgment that Lexington owed a duty to defend Roberts as an additional insured on its policy. (Docket Entry No. 16). Lexington has responded and cross-moved for summary judgment that it had no duty to defend or indemnify Roberts. (Docket Entry No. 18). Roberts has responded, (Docket Entry No. 20), and Lexington has replied, (Docket Entry No. 22). After reviewing the motions, the responses and replies, the record, and the applicable law, this court grants Roberts's motion for partial summary judgment and denies Lexington's motion for summary judgment. The reasons are set out below.

**I.    Background**

Roberts entered into a construction contract with the city of Beaumont, Texas on January 25, 2003. The contract covered improvements at a pump station located at 1550 Pine Street, Beaumont, Texas (the "Project"). (Docket Entry No. 16, Ex. B). On January 28, 2003, Roberts and Eagle-Pro Engineering, Inc. ("Eagle-Pro") entered into a subcontract, under which Eagle-Pro would complete the installation of chemical piping, install an air compressor system, and perform related duties for the Project. (*Id.*, Ex. B). The subcontract required Eagle-Pro to name Roberts as an additional insured on its commercial general liability ("CGL") insurance policy. (*Id.*, Ex. B at 0059). Lexington had issued Eagle-Pro a CGL policy effective from December 9, 2002 to December 9, 2003. (Docket Entry No. 16, Ex. A at 0010). The policy included an additional-insured endorsement. The endorsement defined an "Insured" to include "any person or organization [the named insured is] required to include as an additional insured on this policy by a written contract. . . ." (Docket Entry No. 16, Ex. A at 0038). The endorsement limited coverage for an additional insured to liability "arising out of [the named insured's] work . . . for that additional insured. . . ." (*Id.*, Ex. A at 0038).

On February 19, 2003, Eagle-Pro subcontracted some of the work on the Project to Champion General Services ("Champion"). (Docket Entry No. 16., Ex. C). The plaintiff in the underlying lawsuit, Keith Jenkins, a Champion employee, alleged that he was injured on May 5, 2003, while working at the Project. Jenkins sued Roberts and its employee, J.B.

White, in state court in Jefferson County, Texas.[1]  In the underlying lawsuit, Jenkins alleged that while he "was acting within the course and scope of his employment with Champion General Services at the Pine Street Water Plant, in Beaumont, Texas," J.B. White, a Roberts employee, was "operating a hydraulic jack in an unsafe manner, when a piece of 4 X 4 lumber" hit Jenkins on the forehead and hand. (Docket Entry No. 16, Ex. D).  Jenkins's claims against Roberts included negligent entrustment, negligent hiring, negligent training, negligent supervision, and vicarious liability. (*Id.*).  Jenkins's petition did not refer to Eagle-Pro or to Champion's status as a subcontractor of Eagle-Pro.  Nor did the petition include allegations as to the work Jenkins was performing when he was injured or whether that work was performed on behalf of Eagle-Pro for Roberts, under the Eagle-Pro sub-subcontract with Champion and the Roberts subcontract with Eagle-Pro.

On October 10, 2003, Roberts's counsel sent a letter to Eagle-Pro demanding both contractual indemnity and coverage for the *Jenkins* lawsuit as an additional insured under Eagle-Pro's CGL policy issued by Lexington. (Docket Entry No. 16, Ex. E).  Eagle-Pro did not respond.  On August 16, 2005, Roberts's counsel sent a letter to Lexington demanding a defense and indemnification of Roberts and White in the *Jenkins* lawsuit. (Docket Entry No. 16, Ex. F).  On November 3, 2005, Lexington refused to defend or indemnify Roberts as an additional insured. (Docket Entry No. 18, Exs. C, D).  Lexington based its refusal on

---

[1] *Keith Jenkins v. Roberts, Taylor and Sensabaugh, Inc. et al.*, Cause No. B170384, in the 60th Judicial District court of Jefferson County, Texas.  The underlying suit has since settled.

3

its determination that the indemnity provision of Roberts's contract with Eagle-Pro was invalid under Texas law and that Roberts was not covered as an additional insured under Eagle-Pro's CGL policy. (*Id.*, Exs. C, D).

Roberts sued Lexington on June 29, 2006 seeking a declaratory judgment that Lexington owed a duty to defend and indemnify Roberts in the underlying suit. Roberts moves for partial summary judgment on the duty to defend. (Docket Entry No. 16). Lexington cross-moves for summary judgment that it had no duty to defend or indemnify Roberts as an additional insured under Eagle-Pro's CGL policy. (Docket Entry No. 18). In their motions, the parties dispute whether extrinsic evidence of the Roberts–Eagle-Pro subcontract and the Eagle-Pro–Champion sub-subcontract is admissible under Texas law to determine the duty to defend. The parties also dispute whether Roberts's liability for Jenkins's injury "arises out of" Eagle-Pro's work for Roberts. These issues are analyzed below.

## II.     The Applicable Legal Standards

### A.     The Summary Judgment Standard

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56(c). The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Lincoln General Ins. Co. v. Reyna*, 401 F.3d (5th Cir. 2005) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

If the burden of proof at trial lies with the nonmoving party, the movant may either (1) submit evidentiary documents that negate the existence of some material element of the opponent's claim or defense, or (2) if the crucial issue is one on which the opponent will bear the ultimate burden of proof at trial, demonstrate that the evidence in the record insufficiently supports an essential element or claim. *Celotex*, 477 U.S. at 330. The party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, but need not negate the elements of the nonmovant's case. *Bourdeaux v. Swift Transp. Co., Inc.*, 402 F.3d 536, 540 (5th Cir. 2005). "An issue is material if its resolution could affect the outcome of the action." *DIRECTV, Inc. v. Robson*, 420 F.3d 532, 535 (5th Cir. 2005) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986)). If the moving party fails to meet its initial burden, the motion for summary judgment must be denied, regardless of the nonmovant's response. *Baton Rouge Oil & Chem. Workers Union v. ExxonMobil Corp.*, 289 F.3d 373, 375 (5th Cir. 2002).

When the moving party has met its Rule 56(c) burden, the nonmoving party cannot survive a motion for summary judgment by resting on the mere allegations of its pleadings. The nonmovant must identify specific evidence in the record and articulate the manner in which that evidence supports that party's claim. *Johnson v. Deep E. Tex. Reg'l Narcotics Trafficking Task Force*, 379 F.3d 293, 305 (5th Cir. 2004). This burden is not satisfied by "some metaphysical doubt as to the material facts," "conclusory allegations," "unsubstantiated assertions," or "only a scintilla of evidence." *Young v. Exxonmobil Corp.*,

5

155 Fed. Appx. 798, 800 (5th Cir. 2005).

In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party. *Anderson,* 477 U.S. at 255; *Young*, 155 Fed. Appx. at 800. "Rule 56 '*mandates* the entry of summary judgment, after adequate time for discovery, and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Beard v. Banks*, 126 S.Ct. 2572, 2578 (2006) (quoting *Celotex*, 477 U.S. at 322).

### B.     The Duty to Defend and the Eight Corners Rule

In Texas, "[a] liability insurer is obligated to defend a suit if the facts alleged in the pleadings would give rise to any claim within the coverage of the policy." *Utica Nat. Ins. Co. of Texas v. Am. Indemn. Co.*, 141 S.W.3d 198, 201 (Tex. 2004) (citing *Nat'l Union Fire Ins. Co. v. Merchs. Fast Motor Lines, Inc.*, 939 S.W.2d 139, 141 (Tex. 1997)). This "eight corners" or "complaint allegation" rule generally limits the basis for determining an insurer's duty to defend to the allegations in the underlying lawsuit and the insurance policy language. *Nat'l Union Fire Ins. Co.*, 989 S.W.2d at 141. Several Texas appellate courts have recognized a limited exception to the rule, to allow parties to introduce extrinsic evidence "[w]hen the petition in the underlying lawsuit does not allege facts sufficient for a determination of whether those facts, even if true, are covered by the policy." *State Farm Fire & Cas. Co. v. Wade*, 827 S.W.2d 448, 452 (Tex. App.–Corpus Christi 1992, writ

denied); *see also Mid-Continent Cas. Co. v. Safe Tire Disposal Corp.*, 16 S.W.3d 418, 421 (Tex. App.–Waco 2000, pet. denied). The Texas Supreme Court has not expressly recognized this exception. The Court, however, recently declined an opportunity to reject or disapprove the exception. In *GuideOne Elite Ins. Co. v. Fielder Road Baptist Church*, 197 S.W.3d 305 (Tex. 2006), the Court refused to accept an expansive application of the exception to admit extrinsic evidence that "is relevant both to coverage and the merits" of the underlying case. *Id.* at 309. The Texas Supreme Court noted the Fifth Circuit's earlier *Erie* guess as to whether Texas law would permit any extrinsic evidence in determining coverage issues. In *Northfield Ins. Co. v. Loving Home Care, Inc*., 363 F.3d 523, 531 (5th Cir. 2004), the Fifth Circuit stated that the Texas Supreme Court would be unlikely to recognize an exception to the eight corners rule in cases in which "the petition alleges facts that either (1) potentially fall within a policy's scope of coverage; or (2) where all alleged facts fall outside the scope of coverage." *Id*. The Fifth Circuit stated that any exception to the rule would be limited to cases in which "it is initially impossible to discern whether coverage is potentially implicated *and* when the extrinsic evidence goes solely to a fundamental issue of coverage which does not overlap with the merits of or engage the truth or falsity of any facts alleged in the underlying case." *Id*. (emphasis in original).

Both Roberts and Lexington agree that under the approach the Texas Supreme Court appears to have sanctioned, extrinsic evidence is admissible to show whether Roberts is an additional insured under the Lexington policy. Roberts and Lexington dispute what extrinsic

7

evidence is admissible and for what purpose.

**III.     Analysis**

    **A.     The Parties' Summary Judgment Arguments**

The policy's additional-insured endorsement states that "who is an insured" includes "any person or organization [Eagle-Pro is] required to include as an additional insured on this policy by a written contract or written agreement in effect during this policy period and executed to the 'occurrence' of 'bodily injury' or 'property damage.'" (Docket Entry No. 16, Ex. A at 0038). Jenkins's petition in the underlying lawsuit states only that he "was acting within the course and scope of his employment with Champion General Services at the Pine Street Water Plant, in Beaumont, Texas" when J.B. White, Roberts's employee, "was operating a hydraulic jack in an unsafe manner" and a piece of lumber hit Jenkins on the forehead and hand. (*Id.*, Ex. D). The petition does not refer to Champion's contractual relationship with Eagle-Pro or Eagle-Pro's contractual relationship with Roberts. Lexington agrees that extrinsic evidence of the contract between Roberts and Eagle-Pro is admissible to demonstrate that Roberts is an additional insured under the Eagle-Pro policy. Lexington disputes, however, that extrinsic evidence is admissible to show that Roberts's alleged liability to Jenkins "arises out of" Champion's work under its sub-subcontract with Eagle-Pro for Roberts.

The CGL policy Lexington issued to Eagle-Pro states that coverage for an additional insured is limited to "liability arising out of 'your work' or 'your product' for that additional

insured." (*Id.*, Ex. A at 0038). Lexington argues that under the eight corners rule, nothing in the Eagle-Pro policy or Jenkins's state-court petition shows that Roberts's liability for Jenkins's injuries "arises out of" work Champion was performing on Eagle-Pro's behalf under its contract with Roberts. Lexington argues that as a result, there is no evidence to demonstrate that Roberts's liability to Jenkins arose out of Eagle-Pro's work for Roberts. Lexington argues that extrinsic evidence of the sub-subcontract between Eagle-Pro and Champion is inadmissible because such evidence goes to the scope rather than the existence of coverage and potentially overlaps with the merits of Jenkins's lawsuit.

In response, Roberts argues that extrinsic evidence of the subcontracts between Champion and Eagle-Pro and between Eagle-Pro and Roberts is admissible under the narrow exception to the eight corners rule. Roberts argues that such evidence is necessary to determine whether Roberts's liability to Jenkins "arises out of" Eagle-Pro's work for Roberts and does not pertain to the merits of the underlying suit. (Docket Entry No. 20). Roberts relies on Texas state and federal cases that interpret "arises out of" broadly in interpreting insurance contracts. The Texas Supreme Court initially used this broad interpretation in an automobile insurance case in which a boy entered his parents' truck through the sliding rear window and accidentally touched a loaded shotgun on a gun rack mounted over the window. *Mid-Century Ins. Co. v. Lindsey*, 997 S.W.2d 153 (Tex. 1999). The gun discharged and injured a man sitting in an adjacent parked car. The Court held that the insurer had a duty to defend under the "arising out of" language of the insurance policy; the injury "arose out

9

of" the use of the truck because a "causal connection or relation" existed "between the accident or injury and the use of the motor vehicle." *Id.* at 156. Texas appellate courts applied this broad definition and held that "for liability to 'arise out of operations' of a named insured it is not necessary for the named insured's acts to have 'caused' the accident; rather, it is sufficient that the named insured's employee was injured while present at the scene in connection with performing the named insured's business, even if the cause of injury was the negligence of the additional insured." *Admiral Ins. Co. v. Trident NGL, Inc.*, 988 S.W.2d 451, 454 (Tex. App.–Houston [1st Dist.] 1999, pet denied); *see also, McCarthy Bros. Co. v. Continental Lloyds Ins. Co.*, 7 S.W.3d 725 (Tex. App.–Austin, pet. denied) (citing *Admiral* and finding that the additional insured plaintiff was covered in a suit brought by a subcontractor's employee who had been injured on the job); *accord Lincoln Gen. Ins. Co. v. Aisha's Learning Ctr.*, 468 F.3d 857, 859 (5th Cir. 2006) ("Texas courts define 'use' broadly . . . The phrase 'arise out of' means there is simply a causal connection or relation . . . .") (internal quotations omitted). The Texas Supreme Court confirmed these broad interpretations of "arises out of" in the CGL-policy context in *Utica Nat'l Ins. Co. of Texas v. Am. Indem. Co.*, 141 S.W.3d 198 (Tex. 2004), citing both *Admiral* and *McCarthy Bros.* with approval.

Roberts cites these cases to argue that extrinsic evidence of the Champion–Eagle-Pro sub-subcontract is admissible to show that Jenkins's injury at the Pine Street site "arose out of" Eagle-Pro's work or work done on its behalf for Roberts, establishing a duty to defend

Roberts in the *Jenkins* lawsuit. Lexington argues in response that such extrinsic evidence is inadmissible under the Texas Supreme Court's decision in *GuideOne* because it is not limited to the existence of coverage—Roberts's status as an additional insured—but extends to the scope of coverage. In addition, Lexington argues that even if such extrinsic evidence is admissible, there is no duty to defend because Roberts's liability in the underlying suit did not arise out of Eagle-Pro's work under its contract with Roberts. Discovery in the underlying lawsuit revealed that the work Jenkins and White were doing when Jenkins was insured—repairing a damaged pipe—was not within the scope of the original contract between Roberts and Eagle-Pro, but was the subject of a separate change order agreement between Roberts and Eagle-Pro. (Docket Entry No. 18, Ex. G). The parties dispute whether the change order was in effect, so that the pipe repair was within the authorized scope of work under the Roberts–Eagle-Pro subcontract when the injury occurred.

Each of these arguments is analyzed below.

### B.     The Issue of Extrinsic Evidence

Texas courts that have recognized an exception to the eight corners rule have not limited the exception to the aspect of coverage dealing with the "status" of a party as an insured or an additional insured under a policy, as Lexington argues. (Docket Entries No. 18, 22). Courts recognizing the exception have distinguished "between cases in which the merit of the claim is the issue and those where the coverage of the insurance policy is in question. In the first instance the allegation of the petition controls, and in the second the

11

known or ascertainable facts are allowed to prevail." *Cook v. Ohio Cas. Ins. Co.*, 418 S.W.2d 712, 716 (Tex. Civ. App.–Texarkana 1967, no writ); *see also Int'l Serv. Ins. Co. v. Boll*, 392 S.W.2d 158, 160–61 (Tex. Civ. App.–Houston [1st Dist.] 965, writ ref'd n.r.e). Extrinsic evidence of the Roberts–Eagle-Pro subcontract and the Eagle-Pro–Champion sub-subcontract is not inadmissible because Roberts offers it to prove more than the fact that under its subcontract with Eagle-Pro, it is an additional insured under the Eagle-Pro policy. Courts admit extrinsic evidence not only to show whether a party has the status of an "insured" but also to show whether that party's liability in an underlying suit "arises out of" events covered by the policy, as long as that extrinsic evidence is limited to coverage and does not overlap with evidence that could affect liability or the merits of the underlying suit. *See, e.g., Highland Park Shopping Village v. Trinity Universal Ins. Co.*, 36 S.W.3d 916, 918 (Tex. App.–Dallas 2001, no pet.) (finding that the appellants "were covered as additional insureds" because the injured employee's accident "arose out of" the named insured's work); *McCarthy*, 7 S.W.3d at 731 (holding that the additional insured "was covered by the additional-insured endorsements provided in the policies and was entitled to a defense under the policies"); *Admiral*, 988 S.W.2d at 454 (finding that the additional insured's alleged liability for the injuries of a subcontractor's employee "arose out of" the named insured's operations and was therefore "covered by the 'additional insured' provision"); *Granite Const. Co., Inc. v. Bituminous Ins. Cos.*, 832 S.W.2d 427, 430 (Tex. App.–Amarillo 1992, pet. denied) (holding that the additional insured "is not afforded coverage" because the injured

employee's claim did not "arise out of" the named insured's operations performed by or on behalf of the additional insured).

Lexington relies on two Texas appellate court cases involving the duty to defend insured homebuilders in suits brought by homeowners. In those cases, the homebuilders sought to introduce extrinsic evidence to demonstrate that the allegedly defective work was performed by a subcontractor. *D.R. Horton–Texas, Ltd. v. Markel Int'l Ins. Co., Ltd.*, No. No. 14-05-00486-CV, 2006 WL 3040756, (Tex. App.–Houston [14th Dist.] Oct. 26, 2006, no pet.) (not designated for publication); *Pine Oak Builders, Inc. v. Great Am. Lloyds Ins. Co.*, – S.W.3d –, No. 14-05-00487-CV, 2006 WL 1892669 (Tex. App.–Houston [14th Dist.] 2006, no pet.). Relying on the Texas Supreme Court's refusal to recognize an exception to the eight corners rule, the appellate court in both these homebuilder cases found the extrinsic evidence inadmissible, regardless of the purpose for which it was offered. The appellate court did not refuse to consider evidence of a subcontractor relationship because it pertained to the scope rather than the existence of coverage. Rather, the court acknowledged that such evidence addressed the issue of coverage. The court rejected the evidence because it was extrinsic to the eight corners of the insurance policy and the petition in the underlying case. *See D.R. Horton.*, 2006 WL 3040756, at *6 (acknowledging that the homebuilder offered "extrinsic evidence that the faulty construction work was performed by subcontractors and, thus, was potentially covered under the CGL policies," but refusing to consider the evidence because the Texas Supreme Court "has resisted all opportunities to adopt a permissive

13

extrinsic stance in such cases"); *Pine Oak Builders*, 2006 WL 1892669, at *5 (recognizing that "some state and federal courts interpret Texas law to permit a court to consider extrinsic evidence in determining whether a petition states a covered claim," but refusing to consider any evidence beyond the eight corners in light of the Texas Supreme Court's failure to recognize an extrinsic evidence exception). These cases do not support Lexington's argument that extrinsic evidence of the Eagle-Pro–Champion subcontract is inadmissible to show that Roberts's liability to Jenkins in the underlying suit "arises out of" work performed for Eagle-Pro, the named insured, for Roberts, the additional insured.

Lexington also argues that "[e]vidence that Champion contracted to perform work for Eagle-Pro had the potential to affect the merits of the underlying lawsuit by raising the possibility that another party, Eagle-Pro (that was not sued), could bear some responsibility for Jenkins' injuries." (Docket Entry No. 18, p. 8). As Roberts points out, evidence of the contracts between Eagle-Pro and Champion and between Eagle-Pro and Roberts is offered "for the sole purpose of establishing the relationship between the claimant (an employee of Champion), Eagle-Pro, and RT&S"; it is not "offered to show any alleged 'fault' by any party" or to "contradict any allegation in Jenkins' underlying petition material to the merits of his claim." (Docket Entry No. 20, p. 5). Such evidence shows the circumstances under which Jenkins was working when the incident at issue occurred, not whether, how, or why any injury occurred or who may be responsible. Texas courts do not refuse to consider extrinsic evidence if it is necessary to determine coverage and does not affect the merits or

14

controvert the allegations in the underlying suit. *See, e.g., Gonzales v. Am. States Ins. Co. of Texas*, 628 S.W.2d 184, 187 (Tex. App. – Corpus Christi 1982, no pet.). ("[W]here the basis for the refusal to defend is that the events giving rise to the suit are outside the coverage of the insurance policy, facts extrinsic to the claimant's petition may be used to determine whether a duty to defend exists.").

Extrinsic evidence of the Roberts–Eagle-Pro and Eagle-Pro–Roberts contracts is admissible to show whether Roberts's alleged liability to Jenkins "arises out of" Jenkins's work for or on behalf of Eagle-Pro, under Eagle-Pro's contract with Roberts.

### C. The Issue of Whether the Work was Authorized

Lexington argues that even if extrinsic evidence is submitted, the duty to defend is not is not triggered because the evidence does not show that the work Eagle-Pro was authorized to perform under its contract with Roberts included the pipe repair that Jenkins and White were doing when the accident occurred. Lexington argues that the work on the pipe was not authorized by an effective change order to the Eagle-Pro–Roberts subcontract. As a result, Roberts's liability to Jenkins did not "arise out of" Eagle-Pro's work for Roberts and is not within the scope of its coverage as an additional insured. Roberts responds that the evidence Lexington relies on shows that the work was authorized and that the underlying lawsuit triggered the duty to defend.

The subcontract between Roberts and Eagle-Pro provides:

> [Eagle-Pro] may be ordered in writing by [Roberts], without

> invalidating this subcontract, to make changes in the Work within the general scope of this Subcontract consisting of additions, deletions or other revisions, including those required by Modifications to the Prime Contract issued subsequent to the execution of this Agreement . . . . The Subcontractor, prior to the commencement of such changed or revised Work, shall submit promptly to the Contractor written copies of a claim for adjustment to the Subcontract Sum and Subcontract Time for such revised Work in a manner consistent with the requirements of the Subcontract Documents.

(Docket Entry No. 16, Ex. B at 0052). The record shows that the pipe repair was the subject of a change order and separate written agreement. (Docket Entry No. 18, Ex. F). The record includes a letter dated May 5, 2003, from Randy Clark, Construction Manager at Eagle-Pro, to J.B. White at Roberts. (*Id.*, Ex. F). In the letter, Eagle-Pro stated that it had received a letter from Roberts dated May 5, 2003 concerning a pipe that had been damaged by a previous contractor and needed to be repaired. Eagle-Pro agreed "to accept no liability for repair of the 48" piping connection that was damaged by the previous contractor," as mentioned in Roberts's letter to Eagle-Pro. (*Id.*, Ex. F). Eagle-Pro continued by stating: "Since there is not a written procedure to follow for the needed repair, Eagle-Pro will proceed utilizing your procedure and your direction only." (*Id.*, Ex. F). The letter from Eagle-Pro concluded by stating: "Your signature on this document shall confirm our acceptance and your notice to proceed on these matters." (*Id.*, Ex. F). The record does not show when White signed the letter or when he sent it back to Eagle-Pro. The record does show that Eagle-Pro received the letter signed by White on Roberts's behalf on May 6, 2003, the day after the accident at issue in the underlying suit. (*Id.*, Ex. F). Lexington argues that

16

the parties' agreement incorporating the change order to repair the pipe into the Eagle-Pro–Roberts contract was not effective until Eagle-Pro *received* the signed confirmation from Roberts on May 6, 2003. (Docket Entry No. 18, Ex. F). Lexington asserts that because Jenkins was performing work not authorized by an effective change order to the Eagle-Pro–Robert contract, Roberts's liability for Jenkins's injury could not have arisen out of Eagle-Pro's work for Roberts, as required by the policy endorsement.

In response, Roberts responds that the pipe repair work was authorized because Eagle-Pro's receipt of the signed confirmation letter from Roberts on May 6, 2003 was not a condition precedent to a valid agreement between the parties. Roberts points out that Lexington has produced no evidence, apart from the May 5, 2003 letter from Eagle-Pro to Roberts, to support its argument that not only did Roberts have to execute the confirmation letter, Eagle-Pro had to receive it before the repair work was authorized. Roberts also clarifies that "the authorization for the work was not sought *from* Eagle-Pro, but was sought *by* Eagle-Pro from [Roberts]." It is undisputed that both Eagle-Pro and Roberts had signed the confirmation letter authorizing the work on May 5, 2003. Roberts argues that neither the letter nor other record evidence shows that work on the change order would not be authorized until Eagle-Pro received the signed confirmation letter. Roberts further argues that the parties' conduct on May 5, 2003 demonstrates that the work was authorized and within the scope of the Roberts–Eagle-Pro subcontract. Roberts asserts that regardless of when Eagle-Pro received the signed confirmation, Roberts's authorization of the work "can be logically

inferred" from the fact that White had begun the pipe repair work on May 5, 2003. (Docket Entry No. 20).

Under Texas law, no contract can result from an offer or proposal until the other party accepts it in strict accordance with its terms. *Williford Energy Co. v. Submergible Cable Servs, Inc.*, 895 S.W.2d 379, 384 (Tex. App.–Amarillo 1994, no writ). When a party makes an offer through the mail, a letter of acceptance takes effect upon being mailed or deposited for transmission, not when it is actually received by the offeror, unless the offer requires actual receipt of the acceptance letter to complete the contract. *Am. Heritage Life Ins. Co. v. Koch*, 721 S.W.2d 611, 613 (Tex. App.–Tyler 1986). Performance of the act the offeree was requested to perform may constitute a valid acceptance. *United Concrete Pipe Corp. v. Spin-Line Co.*, 430 S.W.2d 360, 364 (Tex. 1968). In the absence of an express agreement, an implied contract arises from the parties' conduct if their conduct demonstrates a meeting of the minds on the essential terms. *Williford Energy Co.*, 895 S.W.2d at 384 (citing *Smith v. Renz*, 840 S.W.2d 702, 704 (Tex. App.–Corpus Christi 1992, writ denied). A contract may be modified by altering its provisions or adding to them. A modification must satisfy the elements of a contract: a meeting of the minds supported by consideration. *Hathaway v. Gen. Mills, Inc.*, 711 S.W.2d 227 (Tex. 1986).

The record does not support Lexington's assertion that the pipe repair work was not authorized until May 6, 2003, when Eagle-Pro received Roberts's signed confirmation of the May 5 letter from Eagle-Pro. The subcontract between Roberts and Eagle-Pro does not state

18

that change orders would not be authorized until Eagle-Pro actually received a signed confirmation, particularly a signed confirmation of its own acceptance of a change order. (Docket Entry No. 16, Ex. A at 0052). Nor does the text of the May 5, 2003 letter state that Eagle-Pro's receipt of Roberts's signed confirmation is a condition precedent to a valid change order agreement. The letter does not use the terms that usually signify the parties' intent to condition performance on a specific event or occurrence. "In order to make performance specifically conditional, a term such as 'if,' 'provided that,' 'on condition that,' or some similar phrase of conditional language must normally be included." *See Criswell v. European Crossroads Shopping Ctr., Ltd.*, 792 S.W.2d 945, 948 (Tex. 1990); *Hudson v. Wakefield*, 645 S.W.2d 427, 430 (Tex. 1983). The letter states that Eagle-Pro accepts the change order and "will proceed utilizing [Roberts's] procedure and [Roberts's] direction only." (*Id.*, Ex. F). The letter states that White's signature for Roberts will "confirm our acceptance and your notice to proceed in these matters." (*Id.*). The letter did not state that Eagle-Pro had to receive the signed letter from Roberts before the change order would be effective and the work authorized as part of the parties' contractual scope of work. Lexington does not argue that Eagle-Pro failed to send its May 5, 2003 acceptance letter before Jenkins's injury occurred, or that Roberts failed to sign or send back the acceptance letter before Jenkins's injury. It is undisputed that both Eagle-Pro and Roberts signed the letter and that White returned the letter to Eagle-Pro after signing it on Roberts's behalf. It is also undisputed that Roberts began work on the pipe repair work without waiting for

Eagle-Pro to receive the signed confirmation letter. Lexington has not pointed to or produced evidence showing that Eagle-Pro had to receive Roberts's signed confirmation before the change order authorizing the pipe repair work was effective.

Based on the record, this court finds that Roberts was an additional insured under Eagle-Pro's CGL policy and that Roberts's liability to Jenkins "arose out of" work done on Eagle-Pro's behalf under its subcontract with Roberts. As a result, Lexington had a duty to defend Roberts in the underlying *Jenkins* suit. Roberts's motion for partial summary judgment as to Lexington's duty to defend is granted. Lexington's motion for summary judgment that it lacked a duty to defend and indemnify is denied.

## VI.   Conclusion and Order

Roberts's motion for partial summary judgment as to Lexington's duty to defend is granted. Lexington's cross-motion for summary judgment that it has neither a duty to defend nor indemnify is denied. A status conference to address remaining issues and set a schedule to resolve them is set for **September 14, 2007, at 9:30 a.m.**

SIGNED on September 5, 2007, at Houston, Texas.

_____
Lee H. Rosenthal
United States District Judge